Judge Mills
delivered the Opinion of the Court.
In the month of April 1794, Arthur Fox, then claiming a considerable estate in lands, some slaves and personal estate, departed this life, having previously made his last will and testament.
In the will, he devised to his widow two slaves and their increase, by name, and a tract of land of about 463 acres, adjoining the town of Washington, on which he resided at his death, during her life or widowhood.
Two in-lots, with their appurtenances, and four out-lots in the town of Washington he directed to be sold, and the money arising therefrom to be applied to paying his debts, and the balance to be appropriated in building other necessary buildings on the tract of land devised to his wife, for the accommodation of his family. He also bequeathed to his wife, without limitation, six cows and calves, all his hogs, and a horse.
To his daughter Betsey he bequeathed two negro girls, by name, a good bed and furnitme, two cows and calves, and a tract of land on the Oído below the mouth of Locust creek, specially described.
To his daughter Polly he assigned two slaves, by name, a bed and furniture, two cows and calves, *51 and a tract of land adjoining that devised to his daughter Betsey.
Bequests to his son Arthur
Bequests to his daughter Matilda, now the wife of Wood.
Devises for the education of his children.
Military lands.
Farther devises for the education of his children.
Lee appointed executor.
To his son Arthur he devised a tract of land on the Ohio at the mouth of Lee’s creek, and two slaves.
To his daughter Matilda, described in the will as one with which his wife was enceinte, and who was born after the making of the will and before his death, he. devised an entry for 800 acres of land, if the land should be obtained thereby, on the Ohio river, above the mouth of Bracken, also the tract of land adjoining Washington, after the termination of his wife’s estate therein; and also one slave, by name, and another, to be the first child that a certain slave bequeathed to his wife should have.
Part of a disputed tract adjoining the farm devised to his wife, if obtained, he directed to be sold and the money laid out in educating his children.
His interest in an entry of 20,000 acres, (being two-thirds,) entered in the name of John Craig, he directed to be sold, and the money laid out in the education of his children in the best manner.
His military lands North-west of Ohio, to which he was entitled by location, he directed to be equally divided among his children, at the discretion of his executors, after some claims thereon were satisfied.
. After directing sundry claims for land to be given in discharge of some of his contracts, he directs the rent of his station on Lee’s creek to be appropriated to the education of his children-. — and his executors are directed to sell any of his military lands in order to educate his children in the best manner.
He finally directed all his lands not particularly mentioned should be sold for the best price that could be had, and the money laid out to the best advantage for his children.
Plenry Lee, the present appellee, and two others were appointed executors- Lee alqne qualified, the rest declining to act,.
Widow rcnouncos the provisions of pi'Vnmentof dowur.
Leo, the executor, and the testator’s widow intermarry.
Loe appointed guardian children1 *
Objeclions to ihc assign-men o ow-
In the same year (1794,) after his will was recorued, his widow renounced the provisions of the in the county court of Mason, according to law, and the court forthwith appointed commissioners to assign her dower out of the estate. These conamissi0Bers proceeded to assign the tract of land adjoining Washington, which was first devised to the widow, during her i.uc or v/xdownood, and alter-wards to Matilda, and also all the aforenamed lots in Washington to her as dower of the whole estate in lands in Kentucky, and declined assigning dower in or for the lands North-west of Ohio, and also two slaves, one of which had been previously devised, to her first, u the remainder over to Matilda. This allotment was returned to court, approved, aud put to record in May, 1785, and the widow took possession accordingly.
In December 1795, Lee the executor married the wido w, and remo ved her and her family to his own estate, and proceeded to rent out and use at pleasure the lands and slaves assigned as dower, and in other respects to execute the will of his testator.
At the January court 1797, the executor Lee, now husband of the widow, was appointed guardian p,y |jie county court, for his step son, the devisee Arthur Fox, and at January court 1799, he was in like manner appointed guardian for the other children, Betsey, Polly and Matilda.
All the affairs of the estate appear to have passed on quietly, each acquiescing in and not doubt-fug the legality of the dower, as thus assigned, till pjle y-ear ] q; eg w]tCn Arthur Fox, the devisee, had come to mature age, Betsey, the eldest daughter, had intermarried with Richard Graham, Polly with Lawson Dobyns, and Matilda, the youngest child, with Andrew Wood. It was then discovered as was supposed, that the assignment of dower to Mrs. Fpx, how Mrs. Lee, was illegal, not only because a portion of the real estate could not he assigned in lieu of the whole dower in the estate, when the allotment ought to have been of dower by parcels or portions ol each tract; hut because the county court at the date of the allotment had no power to make *53 It — and the assignment as it stood, appeared to hear unequally on the specific devises to Matilda.
New appointment'of commissioners by tho county court to assign the dower.
Difficulties in executing the commission.
Compromiso of the claim of dower.
Bill of Wood, for the rents of tho farm, which had been all assigned and enjoyed by Lee and his wife ns dower, and for a sottiemouf ofthe executor and guardianship accounts againsi Lee, unitii'c; the other devisees linforma.
The devisees or some of them accordingly applied to llie county court, now possessing, by a statute passed subsequent to the first allotment, unquestionable power, for a new appointment of commissioners, and a new allotment of dower.
These commissioners commenced the undertaking and proceeded as far as the slaves; but when they came to the lands, great and new difficulties arose in the way, not of Lee only, but in the road of the devisees. The slaves had now increased to near fifty in number, which increased the share of Mrs. Lee. And Lee, if put to the legal rule, and compelled to account for two-thirds of the rent of the farm adjoining Washington and the lots in town, which he had hitherto enjoyed as the supposed dower of his wife, retorted the claim of dower to the lands and rents thereof, in the specific, devices to Betsey, Polly and Arthur, and also to the whole lands undevised, including those which he had sold as executor, those remaining on hand, and some which had been sold by the testator, the dower whereof was not relinquished, and which if enforced, must bring back the grantees upon the estate by force of their warranties.
Surrounded with those difficulties, the devisees themselves paused and began to negotiate, and ultimately presented to Lee, written terms of accommodation, which he accepted, in which they agree to give him seven thousand dollars, in full for his claim to dower, in right of his wife, to be paid by each in proportion to the value of their specific devises, and Lee and wife to relinquish all further claim, and to surrender the possession of the farm adjoining Washington, to Wood and wife.
After this, Wood and wife filed this bill claiming the rents of the farm adjoining Washington as belonging to their specific devise, from Lee, and also requiring Lee to setttle up his accounts as guardian of the heirs and executor of the estate of Arthur Pox, deceased.. The rest of the heirs and devisees as well as Lee, were, proforma, made parties to this bill.
Decree pf the eircuit court ibr Wood S¿ wife against Lee, for the balance on the settlement.
County courts of Virginia had jurisdiction to assign dower, and it was supposed for years after the separation, our courts had also the power, and it was exercised years.
Discovered the county couitshad no jurisdiction to have dower assigned.
And the power confered bv the act of 1803.
An assignment of dower was made by the county conrt before it had jurisdiction, and the estate accordingly held in good faith formally years. On the discovery of the defect, the chancellor would con-' firm what had been thus done without authority.
*54 The court below decreed against the claim for the rents of the farm while she held it as dower, and after settling up the accounts with Lee as executor and guardian, there appeared a balance in his favor on each account, and for Wood’s proportion of these balances the court rendered a decree against him and his wife in favor of Lee, from which decree Wood and wife have appealed.
We concur with the court below in disallowing the claim for the rents of the farm devised over to the complainant Matilda, and enjoyed by Lee as dower. If this claim was considered apart from, and uninfluenced by the compromise, the decree would not be of that favorable character to Lee, which his adversaries seem to suppose.
It was long the impression of the county courts in this country, that they were authorized to assign dower, and the mistake seems to have arisen from the practice in Virginia before the separation of the two States. The county courts of Virginia had an undoubted right to assign dower; for they possessed jurisdiction of matters of common law and chancery, dower included, and by proper pleading could act therein, and in many cases they acted in a sum-, mary way on these matters.
After the separation, this general jurisdiction of suits, and matters at common law and in chancery was taken away, but the county courts seemed to suppose as testamentary cases, and the estates of intestates were left with them sub modo that they could still assign dower, and they continued the practice long before it was discovered by the constituted authorities of the country, that no such power existed.
This discovery produced the act of 1803, 3d Litt. L. K. 133, granting the power, long after this assignment was made, and this act was no doubt the result of finding that the practice theretofore exercised without law, was a convenient one.
In this case, neither the widow, the commissioners appointed by the court, nor the court itself, seemed to doubt of their power; and Lee, who after- *55 wards came to the estate by marriage, seems evidently to have labored' under the same mistake, throughout, and there is not the slightest evidence or circumstance in this cause conducing to shew, that he knew better, and yet'acted the contrary, and there is nothing therefore, to reach his conscience, or to sustain the charge that in using the estate under the assignment,, he did an intentional wrong to his ward, and child of his testator. What then would have been the decree of the chancellor, if applied to, to correct this allotment, because it was made without authority?' He would evidently have acted on the equity of the case, and if the allotment or assignment had done no more than what the widow had a right to claim, he would have confirmed the grant, and given to it the legal authority, which before then it did not possess. So that the question would rest upon the quantum, assigned, and the other objections made to this assignment, to-wit: that one entire parcel or tract could not be assigned in lieu of dower in the whole land to the prejudice of one devisee.
Dower shall be assigned by parcels out of each tract, and not one entire tract allotted for dower in all the estate.
On the correction of an endowment of the widow, of all one tract, instead of a third of each tract, she or the owner of the other tracts, shall pay the other the difference between the rent of the tract she held and one-third of all, whore-, of she was dovrable.
it is admitted that the widow ought to ho endowed by parcels, and that the chancellor would correct this error.
But what correction would he apply? He would in future take the dower of. the tract first assigned, •and as to time past, he would have assessed the rents of the remaining two-thircls, and also the rents of one-third of the remaining estate, and if the former exceeded the latter, he would only have compelled the tenant in dower to have accounted for the excess,; or if the latter exceeded the former, he would Rave made up the deficiency to the tenant. By this rule Lee in the present case could only have been compelled to account for the rents, which he might have received, so far, and so far only, as they might have exceeded one-third of the rents of the whole estate, and not for the entire amount of two-thirds of the whole rent.
But it may he said that this would havé borne partially on the devisee Matilda, by having the dower to fall exclusively, on her specific devise. *56 To this there would have been a plain and adequate redress. Matilda for this, would have been entitled to a claim against the general estate for remuneration, or to a right of contribution against the rest of the devisees for this disproprotionate charge against her estate. For as the claim of dower was valid and must Ml some where on the estate devised, or descended, the chancellor would have equalised it among the devisees, and if it should have been on one, he could call the rest to his aid.
Wher", in such case the tract of land thus incumbered with the whoiu claim of dower, had been devised to one of nuincious devisees, that devisee shall he indemnified lor the back rents out of the general fund, or by the other devisees.
Dowager thus T/ron-fully endowed of one entire tract, which liad been devised to her infant daughter, married the executor, and he was appointed guardian for the devisee, and so acted, yet continued to hold and enjoy the land as dower, in right of his wife, ¡ill this ward having married, she and her husband demands an account of the two-thirds of the rents: — Not allowed: the wrou^ having-boon by an innocent mistake, the devisee, who had been thus burtbened, shall look to the devíseos o'f the other lands for remuneration;
*56 To this mode of settling this matter, this objection lias been made in argument. Lee was the-guardian of the infant Matilda, and as such represented her rights, and was therefore bound to act legally for her; and it was therefore hlr duty so soon as he was appointed guardian, to remove this partial, weight of dower, which was coining to himself from her specific devise, by procuring a proper assignment, and rectification of the mistake; and not having dono so, lie must now bear the whole consequences of the loss.
The conclusion does not follow from the premises. That he was hound to represent his ward legally, must he admitted, and if he had knowingly placed upon her, the whole burden of dower, or kept it there, he ought to he compelled to rectify the matter and redress the wrong. But if he had done this against conscience, it would not have barred him from asserting the whole claim of dower against the residue of the estate. His wards when asking equity, would have been bound to do equity, and to have permitted him to come in for his rightful share elsewhere. If this be the rule, even when the error was unconscientiously committed, afmtiori, the same rule must prevail, when the act was done through a mere innocent mistake of law. For, as before supposed, this all happened without a suspicion of wrong. One circumstance among many others which need not be noticed, is conclusive of tbc fact. Lee, as executor, sold lands and appropriated the proceeds to the payment of the debts, and the education of tlie children as directed by the will. In these lands, he had a right of dower through his wife, on the supposition that he had no dower *57 already assigned. He conveyed lands in discharge of his testator’s contracts; and all this time he claimed no part of the money and retained not his dower, thus shewing clearly, that he supposed that right already legally satisfied. While therefore the right of Matilda is admitted, to have this mistake (and a mere innocent mistake it is) rectified, she cannot place the whole loss upon Lee. His right tc> the entire dower of the estate was clear, and while he would be compelled to rectify, retrospectively, the whole devisees would have to bear that rectification, and Lee could in no évént have been compelled to sustain the loss, further thaft the rents which he had received, might have exceeded his dower claim upon the whole estate, and whether there would have been any excess, from any thing ápparent in this record, cannot be ascertained.
Compromise..
Objection to the extension, of the compromise agreemont to the past rents;
Parol evidence not competent to' vary a written agreement to support a demand, but may be some;, times used to resist a recovery.
On the assignment of dower, the dowager be,J comes enti/tied to Rack rents.
*57 Hitherto we have considered this case áS not affected by the compromise made in 1814, and we shall now ascertain the effects of that compromise Upon this controversy.
Here it is insisted for the appellants that tliis writing does not in terms express that the consideration of the agreement is the claim for rents; nor is it said that that claim is extinguished or released; and therefore, in its own terms it affords no aid to the appellee, and that parol proof, which is offered here, is wholly inadmissable to add to, or vary, or com tradict its terms, and therefore the claim is still at large.
We admit the general rule, that parol proof cánilot he used to vary written instruments, in all its force, and we will also waive thé inquiry whether Lee, standing in the attitude of a defendant here, and resisting the claim, can, or cannot avail himself of any exception to the rule, and on parol proof to defeat a recovery, which in some cases is allowed; and still we conclude, that to tolerate a recovery While this argument lay in the way would he unoonscientious.
We have seen that Lee was only liable for excess of rents, if any, which he might have received, and the estate itself must bear the residue, and that *58 on rectifying the error, the dower of Mrs. Lee would fall on the whole estate, both for time past and to come, which must be a severe fetter on the enjoyment of it by the heirs, for the remaining life of Mrs.' Lee.
'Widow is entitled to'dower of the nnilevised lands, though she Re a large devisee of other real estate not expressed to be in lieaofdow'er,without renouncing the provision o'f tlfe will.
The Act requires the widow to elect between the provisions of the will and of the law, only as to chattels & slaves, and so She do not claim under and against the will, she may have Roth her devises and dower.
It is worthy of remark, that if Mrs. Lee had not renounced the provisions of the will, her right of dower generally in the undevised lands, would have been somewhat dangerous under this will. For no devise of lands is made to her expressly in lieu of dower, and our statute only compels widows to abide by the will • as to chattels and slaves, and in many cases a widow may have dower' of lands, though áre be a devisee of lands to a considerable amount, and the only restraint to her claim is to put her to her election either to claim against or under the will; and that election in some cases she will not be compelled to make, as held at the present term in the case of Bailey & wife vs. Duncan’s executor; and the only way to confine Mrs. Lee to the devise, ■ would have been to compel her to make her election to abide by the will, if they could. The claim therefore against Lee, held by Woods & wife, was contingent and small, while the claim of- Lee was large and appalling to the heirs, especially as some of them had sold part of their lands, and one had leased his share for fifteen years, and they must have become responsible to thfeir grantees,' if dower had fallen upon their lands.
The construction therefore, which the appellants put upon this transaction of compromise, supposes that it has entirely a one sided bearing — that it has extinguished Lee’s claims — but left their own in existence — that Lee’s arms are taken and his hands are tied, while his adversary possesses his weapons with a full power to strike. The transaction itself speaks a different language. Lee himself now offers to rescind the compromise and take the original ground; but the other heirs disagree to it. Whether the appellants have or have not yet the right to come upon the whole estate, and the other heirs and devisees, to 'equalize this claim for dower, which heretofore has borne hard upon the share of Matilda, or whether this compromise has barred his *59 claim as to them we need not inquire. Por ah though the appellants have made them defendants, it is only as to executorial and guardian’s accounts, and there is no claim set up for contribution as to. these rents against them.
Where an ini strument of compromise reciied, that whereas great difficulties had arisen, about what did not clearly appear, on a controversy afterwards whether a certain claim was included — held that parol evidence was competent to prove the claim was among' the dif~ firulties, and so, settled.
But all the parol proof which has been offered here, we conceive is admissible consistent with the general rule, which excludes its effect on written instruments. The agreement itself recites, that—
“Whereas great difficulties have arisen in setting apart the dower attached to the estate of Arthur Fox, deceased, to remedy which, the undersigned legatees of said estate are induced to make the propositions contained in the following article, which if acceded to, we bind ourselves to comply with:
We agree to give Mrs. Lee in perpetuity seven thousand dollars, in lieu of her right of dower in said estate, to be paid and secured as hereafter mentioned.”
The writing then proceeds to provide for the payment, and each binds himself, severally, in proposition to his or her specific devise. Woods agrees to refund to Lee, $441, which Lee had previously fiven fp,r a claim to part of the farm in contest, and ■ee, on their compliance, was to surrender possession of the farm — give up necessary title papers belonging to the estate, and relinquish dower in all. Wood the present appellant some time afterwards executed to Lee his bond, to.secure his proportion of the title of some estate taken in lieu of said seven thousand dollars, and that bond recites, that—
“Whereas many difficulties have arisen i% settling the claim to dower of the widow of Arthur. Fox, de^ ceased, and in order to adjust the same, it has been agreed between the aforesaid Henry Lee, who, inter" married with the said widow, and the heirs of the said Arthur Fox, deceased, that the said Lee should receive from the said heirs seven thousand dollars, in lieu of and lull satisfaction of the said claim to. dower.”
The instrument then proceeds to guaranty the title to one-fourth of the estate paid to Lee in discharge of part of the seven thousand dollars, thq *60 title to which, could not be made owing to the death of Mrs. Graham and the infancy of her children.
%t seems the construction put upon a ■writing by' one party,be^ fore its exeeution, is competent to explain a latent ambiguity.
An applica-s lion by one party to bo rclcuspd from p demand founded on his adversary’s construction of a ■written agreement, proves noth- %•
Now, on reading these instruments, it may be asked what claim of dower was settled. The appellants say, the prospective claim only, and Lee by -entering into the writings lost all rights retrospectively. The fair construction is the whole claim past, present and to come.
But by these writings we are told some difficulties are settled, and are to sleep forever. What, these difficulties are we are not told, because they were not again to be revived. Is it not competent for parol proof to tell wliat they arc, lest some of them should receive and have their effect contrary to the intention of the parties? It certainly is, and when they are ascertained, they are the claims of the ap? pellants against Lee, for the enjoyment of dower wrongfully to their prejudice, and the countervailing claim of Lee, ready to fall in consequence thereof, upon the whole estate, which was the occasion no doubt, of some uneasiness to the heirs and devisees. These were therefore adjusted and must be permitted to rest, as to Lee.
This is evidently the construction placed on these writings by ihe appellant Wood himself, after they were shown and before they were executed. He hesitated nearly a year before he would execute them, and the reason assigned for that hesitation was, that he was not willing to relinquish to Lee his claim for rents on the dower farm. At length however, he closed the contract and must now abide the consequences.
It is objected against this construction, that Lee, about a year afterwards, drew up and tendered to Wood a release of these rents, while Wood refused to execute, as to the farm, but did so as to the estate in town. To this it may be answered, that this act of Lee, could not alter the effect of the previous transaction, and is accounted for, by Wood’s threatening to sue him for the rents. As a measure of greater caution, and to make the first assurancq now sure, he drew up and tendered a formal ye; *61 .'lease, which Wood only executed as to the town estate.
Settlement of the executor or guardian, with the county court, pending a hill against them on the same matter, is nought — -
But — An agreement of counsel that such settlement shall have thosame effect as if made before the bill filed, gives it the same operation.
Held to be no objection, under the circumstances here, that Lee’s accounts asexe ■ cutor and guai diari, were not made out altogether sop aratod.
*61 We therefore, conclude that the decree of the court below, as to this claim for rents, which is one great object of this suit, is correct.
We shall next proceed to the consideration of the bill, so far as it seeks to settle the accounts, of Lee as executor and guardian.
Before the bill was filed, Lee had made a settlement of his executorial accounts with the county court, and after * filing the bill, he caused an additional settlement to be made and filed in the suit. Before the bill was brought he had never settled with the county court as guardian; hut caused a settlement to be made pending this suit, and filed it also. The court below, in rendering the interlocutory decrees does express the opinion, that such settlement, with the county court pendente lite, were as good evidence as those made before, which is contrary to the previous decisions of this court.
But that error in opinion, can have no effect on this decree, although the accounts here were referred to commissioners under that error. For on the account settled as guardian, there is an express admission by the complainants counsel, which is noticed by the court in the final decree, that the account shall be received and have the same weight as it would have had, if made before this suit was brought. The court also notices a similar agreement, as to the additional account as executor. But without such agreement, the items of this account, is not objected to, though it is referred to in an amended bill, and what is more, this settlement is greatly in favor of the complainants, as it gives them large credits, to which they would not be otherwise entitled.
It is also objected to these accounts, that both the executor’s and guardian’s accounts are blended — that is, many items are charged and others credited by Lee, as executor, rvhich ought to have been done as guardian and vice versa. This appears to be the fact. But as the exeputor and guardian is the same *62 person, and there is no controversy here about interest against Lee, but only about interest in his favor, as he was largely in advance with the estate, as the county court had jurisdiction of his accounts, both as executor and guardian, we perceive no force in this exception, if his accounts are otherwise right.
When the testator provides for the education of all his children, out’of the same funds, and it appearshe. intended all his family should be kept together, therp need npt be separate accounts kept for each child.
Education of the children, in Fox’s will, included the bringingup the children, as well as the expenses of their instructions.
it is objected to the accounts, for expenses for boarding, educating, and clothing the children, that they are joint against the whole estate, when the expenses of each child, ought to have beer, separately charged, and credits given in like manner. When it is contemplated hy a testator, that his family shall be kept together, and be supported out of an undivided estate, the rule is, otherwise, whatever-may be required in other cases. It would be almost impossible to keep in such case a separate account, and no use could be made of it. It is clear, we conceive from the will of the. testator herp, that he designed his family to remain together, and be well educated, as is manifest by his general fund provided for the education of the whole, and his expressly directing the profits pf one farm, speeificaL ly devised to his son, to he applied to the education of the whole, which embraces bringing them up as well as teaching them literature and science. The intention is thus manifested, that all should live on_ one common stock, till they were able to provide for themselves.
In the accounts themselves, the complainants attempt to surcharge and falsify many items, most of which, present no legal question, or the attempt has been wholly unsuccessful, and they will therefore, he passed unnoticed, especially as the controversy concerning them, has been rightfully settled by the court below.
It has been urged in argument, tbat the charge for hoarding the devisees is enormous, and extended to ages, when the devisees were able to support themselves; that such allowance ought not to he made for any part of the time, or at all events, after the children hy their own industry, were able to earn their boarding. It must have escaped the attention *63 of counsel, who- used this argument, that the question is not made in the pleadings. The complainants have not only pointed out in their bill, those items which they wish to attack, but also those, which they are willing to admit, and in the latter class, have expressly included the whole charge for boarding.
■Where the compensation to the executor and guardian is settled in the interlocutory decree, and the account made up accordingly, the objection can be raised here, though the commissioners report was not excepted to below.
The only remaining questions worth attention, are the following:
1. It is insisted that the compensation allowed to the executor and guardian, is unreasonable and enormous.
2. That the court erred in rendering a decree against the complainants, Wood & wife, for their proportion of the balance found in Lee’s favor on the settlement of his accounts; he, not having filed a cross bill, or expressly prayed for such decree.
It is true, that the repoit made in the cause by these latter commissioners, was not excepted to; but the court discuss and settle the principles of Lee’s compensation, and give directions to the commissioners in the interlocutory decree, and therefore, any error in the compensation allowed to Lee by the county court, if such exists, is properly presented to us.
The personal estate, proved inadequate to pay the debts, by nearly three hundred dollars. The resources left to maintain and educate the heirs, must then be derived acccording to the will, from the undevised lands which are directed by the will 'to be sold.,
The compensation allowed to Lee consists in the following items. The lands could not be easily sold "at all times, especially as the titles were unsettled, and many of the lands undivided, and Lee not waiting to realize these resources, made large advances to the estate, and at all times appears to have, had it considerably in arrears to him. When he settled with the county court, a large balance was ascertained to be long due to him, and that court allowed him interest on that balance, for the space ef -six years.
Allowance for the services of the executor and guardian and for commission for advances and interest*
Services performed by Lee in rola-1 tibn to the lands.
■That court further allowed him payment"for per* sbnal expenses, and in a few instances for his time in. travelling from orié court house to another, and indeed, from one. State to another, to see to and manage the lands bf the decedent. , In the same account, the debits and Credits aré. added together, and ten per céntum commission is allowed Kim upon the' whole amount, including every item of board, interest, time and trouble, on one side, áhd every pay-4 ment on the other, thus giving ten per cent upon all monies which came to his hands; and ten per cent when it was passed away, and not only so, but every1 charge which he had against the estate,- was thus inJ creased ten per cent; and Cn all money advanced by liim, he thus received first, ten per céíit, and then six per centum per annum, for interest. This per centum was, however, removed from many of these articles by the decree of the eourt below.-
We do not hesitate to say, tKat Lee, for his management of this estate, merits ás great an allowance, as perhaps, should be' allowed in any case. The personal estate was not large', and inadequate to pay the debts. The slaves appear to' be females, with increasing families, and were at first few in number, and afterwards unprofitable, dnd indeed expensive.The landed estate was one in embryo — at the death of the testator, large in quantity,-yet of very small value, and could only he valuable by being attended to with a burdensome and expensive care, and be thus preserved from intrusion; and their titles be' defended, until by growing in value, with the advancement in population and wealth of the two new states in which they were situated, they would become a fortune to each child. Some of the titles to these lands were equitable only; some consisted in parol evidence, and others were'undivided interests held in common or jointly with others. These interests were reduced- to certainty by Lee, and-when the heirs came of age, the estate, according to the estimate of the heirs themselves, was rated at the value of forty-nine thousand dollars as for the minimum, and sixty thousand as the maximtan price.
Pricesoflands notice'- by the court asa part of the history of the country.
An executor and guardian charged by the will with the management of the lands-involved in controversy, who performs the duty with skill and diligence, is not limited in his compensation by the ordinary rules.
Act giving the county-courts the power to allow the compensation to executors.
Allowance made by the county court to executors, &o. will not be disturbed, unless there appears to have been an abuse of the authority or, an imposition practiced on the court.
Practice of allowing the , executor 5 pr. cent on the sum passed through his hands does^ courtTo that ■sum.
*65 It is evident to all who know the history of this State and that of Ohio, in years past, that if Lee, had disposed of enough of these lands to pay the balance of the debts and educate the family in the manner directed by the will, and at an early period, the estate must have been greatly lessened in value if not expended.
Instead of this, lie expended his own money for these purposes, ancl was every hour in advance with the estate. In short, he had not only the ordinary duties of an executor and guardian to perform, but the part of a manager of the estate and investigator of land titles; and the proof is clear that he performed this part with assiduity, diligence and skill. It is therefore evident, that he is not only to he paid as an executor and guardian, hut for other services important and arduous, and his compensation cannot be limited by any ordinary rules, which govern cases of executors and guardians only. Moreover, the will of the testator does not leave this estate to he managed according to the legal principles which govern the estates of intestates.
The act of Assembly provides,, that “executors and administrators shall be allowed in their accounts, all reasonable charges and disbursements, which they shall lay out and expend in the funeral of the deceased, and other their administration, and in extraordinary cases may be allowed such recompense for their personal trouble, as the court on passing their accounts, shall judge reasonable.”
By this act, the county courts have the power to fix the «..ompensation, and their allowance ought not to he disturbed, unless an evident abuse of their authority appears, or a deception practised upon them by the party passing his accounts is proved, and in this case, the proof on that point adduced by the appellants fails, while that of the appellee shows, that his services and expenditures were indeed extraordinary.
It seems to he supposed by the appellants, in their hill and arguments, that this allowance of the county court is subject to he reduced by some legal standard which the county court could not transcend. *66 We are aware of no such standard. The judgment °f die county court is the measure, subject to cor-for the causes already stated. It is true, that the courts of equity, as well as the county courts, both in Virginia and this State, have fixed for their rule, to make their allowances uniform, a per centum, by which they are governed 'in ordinary cases. Five per centum on money received and disbursed, has been the lowest point.
A higher commission, gross sum, SerCdiemn<1 charges have heen allowed in different
When this court is apfor^e^e°'s sionof ^such an allowance the question great aíum in all been given.
When upon thehearing of a bill for an appears a balance for he°ma0nhTe a decree for'ít against complainant, express prav- or for it '
In some cases, seven and one half, in others, ten has been allowed. But a gross sum in other cases has been allowed, without regard to any per centum, and in others, a daily allowance or special charges f°r each act of trouble and time, have been passed; and however the allowance may he made or calculated, its justice is the main enquiry, and unless it is Unjust, after the judgment of the county court, it must remain unaltered.
When tested by these rules, and the circumstances of this case are considered, we cannot say that the allowance to Lee ought to be more reduced than it was reduced by the court below, who corrected this Per centum by taking it off from many of the expenditures. Put the allowance of interest for the money advanced, the few days for which Lee charged wages, (and they are very few when he was employed during many,) and the per centum allowed him by the court below, together, and we cannot say that he will receive too great a reward for what he has done, or that similar services could be procured for the same money.
As to the decree against Wood and wife, in favor of Lee, who was defendant, it is a well settled principle of practice, that the chancellor, when called up0n by a complainant to settle accounts, will decree the balance m iavor ot the defendant, it it be in his favor; and why should it not be so? The ^a^ailce struck, would be conclusive in any future proceedings to recover it, and why turn the deiendant around for the mere sake of form, to a new proceeding, which could not be resisted? The chancellor prefers the finishing the whole controversy, -it* , . -it , - , J and the complainant who demands the settlement ol *67 accounts, gives a pledge that he will submit to a de-cree for the balance, if it be struck against him.
Hoggin, for appellant. Crittenden, for appellee.
It is true, Lee does not expressly pray for such de-. cree in his answer; but he insists on his accounts as a set oif, and claims that the balance is in his favor.
Upon the whole case, therefore, we conceive there is no error in the decree of the court below, and it must be affirmed with costs and damages.